UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RANDALL GENTRY CLEGG,                                    Case No. 6:15-cv-01661-MTK

            Petitioner,                              **OPINION AND ORDER**

    v.

JEFF PREMO,

            Respondent.

_____

**KASUBHAI, District Judge.**

      Petitioner Randall Clegg brings this habeas corpus proceeding under 28 U.S.C. § 2254

and challenges his 1995 state court convictions for murder and assault, among other offenses.

Petitioner primarily contends that he was convicted in violation of his rights to receive the

effective assistance of counsel and to confront witnesses as guaranteed by the Sixth and

Fourteenth Amendments. For the reasons explained below, Petitioner fails to establish

entitlement to habeas relief, and the Petition is DENIED.

1    - OPINION AND ORDER

## BACKGROUND

In January of 1994, Petitioner, his brother Grover Clegg, and Reschard Steward were charged by indictment with offenses including Aggravated Murder, Conspiracy to Commit Aggravated Murder, Solicitation to Commit Aggravated Murder, Felony Murder, Assault in the First Degree, Burglary in the First Degree, and Unauthorized Use of a Vehicle. Resp't Exs. 102-03, 153. The charges arose from a murder-for-hire scheme that resulted in the July 1993 shooting death of Tina Clegg, Grover Clegg's wife.

Eventually, all three defendants were tried jointly in a capital jury trial that lasted over eight weeks and involved dozens of witnesses.[1] *See generally* Amended Transcript of State Court Proceedings (Tr.) (ECF Nos. 29-36). As summarized by the Oregon Supreme Court, the following evidence was presented at trial:

> On July 30, 1993, [Grover Clegg's] wife, Christina (Tina) Clegg, was shot and killed by two gunmen wearing ski masks who burst into the Albina Head Start office where Tina worked as a receptionist. One of the men walked directly toward Tina and shot her several times; the last three shots were in a straight line down her back, in a manner that indicated that the shooter had stood over her and shot downward. After shooting, the men asked for money, but left without taking anything of value. One of Tina's coworkers also was shot in the chest in the incident. One of the intruders carried a silver gun, but police never found the murder weapon. At least in part because of the manner in which Tina was murdered, police soon began to suspect that the motive for the attack was not robbery, as first thought, but Tina's murder.
>
> Ultimately, [Grover Clegg] was indicted and charged with aggravated murder, conspiracy to commit aggravated murder, felony murder, intentional murder, assault, burglary, and two counts of solicitation to commit aggravated murder. The charges were based on allegations that [Grover Clegg] arranged for the

---

[1] Grover Clegg was charged by separate indictment and initially his case was not joined with Petitioner and Steward's. *See* Resp't Exs. 102-03, 153. Upon motion by Grover Clegg, the trial court preliminarily joined the cases for discovery and pretrial purposes, and the trial court denied Petitioner's and Grover Clegg's subsequent motions to sever the cases for trial. *See, e.g.,* Resp't Exs. 123, 177-78, 183.

murder of his wife. At trial, the state's theory of the case was that [Grover Clegg] had orchestrated the foregoing events because he was unhappy in his marriage to Tina, but did not want to risk either losing his home or paying child support as a result of divorce, and because he wished to collect the proceeds of a $100,000 insurance policy on Tina's life. According to the state, [Grover Clegg] asked his brother, Randall Clegg, to find someone to kill his wife.

The state presented evidence that Randall had made more than one effort to find a killer. Randall first hired a man named [Curtis] Deskins to murder Tina for about $1,000. Deskins borrowed a gun from a friend, and Randall loaned Deskins a car and provided him with a photo album containing pictures of Tina. Deskins did not carry out his assignment, however. On one occasion, Deskins failed to carry out the plan because Tina unexpectedly went to church. The next day, Randall again loaned Deskins his car, telling him to return it after he had committed the murder. However, Deskins instead picked up a few friends, began drinking, and ultimately drove Randall's car into a pole. The police officer who dealt with the collision found assorted unfired bullets in the car and, in the trunk, a box of shotgun shells, a long-sleeved black T-shirt, and a black ski mask.

About two weeks later, Randall hired two other individuals, [Reschard] Steward and [Larry] Matthews, to kill Tina. The two also were to be paid $1,000 for the job. Tina's teenage daughter testified that, on the night before the murder, she saw [Grover Clegg] with Randall and Matthews in the basement of [Grover Clegg's] house; the Cleggs were showing Matthews a small silver gun. After the murder, Steward told friends that he had stolen the car that was used in the murder and that Matthews was the shooter. Two of Tina's fellow employees confirmed that Steward was one of the two intruders on the day of the murder, but was not the one who shot Tina.

*State v. Clegg*, 332 Or. 432, 434-35 (2001).[2]

During the State's case-in-chief, the trial court allowed several witnesses to testify about inculpatory statements Steward made in their presence, some of which referenced Petitioner's and Grover Clegg's participation in the murder scheme. *See State v. Clegg*, 161 Or. App. 201, 206 (1999); *see also* Resp't Exs. 119-23, 158, 160, 170; *see also* Tr. at 3528-33, 3574-81, 3610-

---

[2] Larry Matthews, the alleged shooter, was killed "in an unrelated incident" before charges were brought against him. *Clegg*, 332 Or. at 435 n. 1.

**3  - OPINION AND ORDER**

12.[3] Steward did not testify and was not subject to cross-examination, and Petitioner and Grover Clegg likewise did not take the stand in their defense.

The jury found all three defendants guilty of the charged offenses and, after a week-long sentencing trial, recommended that Petitioner be sentenced to life without the possibility of parole on the aggravated murder conviction. Resp't Exs. 180-81; Tr. at 6557-59, 7297-98, 7300. The trial court imposed a true life sentence in accordance with the jury's recommendation. Tr. at 7363.[4]

After an unsuccessful direct appeal, Petitioner sought post-conviction relief (PCR) in the Oregon courts. Resp't Exs. 104-08, 109-115, 199. In his Eighth PCR Petition, Petitioner alleged claims of ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and trial court error. Resp't Ex. 199. The PCR court denied relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Resp't Exs. 202-04, 211-13.

On September 2, 2015, Petitioner brought this federal habeas action, and on April 14, 2017, he filed a First Amended Petition.

## DISCUSSION

Petitioner's First Amended Petition asserts thirty-three grounds for relief, Claims I through XXXIII, with many claims including several subparts. *See generally* First Am. Pet. (ECF No. 53). In January of 2023, the Governor of Oregon commuted Petitioner's sentence, and Petitioner withdraws all claims challenging his sentence, including Claims III(M)-(O) and Claims IV(J)-(L). Pet'r Suppl. Br. at 1-2, 62-63, 89-90 (ECF No 168). Respondent contends that

---

[3] Citations to transcript page numbers refer to the page number located in the bottom right hand corner of the transcripts, e.g., "TRANSCRIPTS, Page 3610 of 7367."

[4] The trial court imposed consecutive sentences of imprisonment on the remaining counts. Resp't Ex. 101; Tr. at 7363-64.

most of Petitioner's remaining claims are unexhausted and procedurally defaulted, and that the PCR court reasonably rejected Petitioner's exhausted claims.

## I. Exhaustion and Procedural Default

A state habeas petitioner must exhaust all available state court remedies – either on direct appeal or through collateral proceedings – before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A). To meet the exhaustion requirement, the petitioner must "fairly present" a federal claim to the State's highest court "in order to give the State the opportunity to pass upon and to correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (quotation marks omitted); *Cooper v. Neven*, 641 F.3d 322, 326-27 (9th Cir. 2011). "A petitioner fully and fairly presents a claim to the state courts if he presents the claim (1) to the correct forum; (2) through the proper vehicle; and (3) by providing the factual and legal basis for the claim." *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009) (per curiam) (internal citations omitted).

If a claim was not fairly presented to the state courts and no state remedies remain available to do so, the claim is procedurally defaulted and barred from federal review. *Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991); *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) (explaining that "procedural default may be *caused* by a failure to exhaust federal claims in state court"). A federal court may consider unexhausted and procedurally barred claims only if the petitioner demonstrates cause for the default and actual prejudice, or if the lack of federal review would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 750.

Respondent acknowledges that Petitioner exhausted part of Claim I (relying on *Crawford v. Washington*, 541 U.S. 36 (2004)) and Claims III(C), IV(B), (C), (E), (I) and XXXIII on direct

and PCR appeal. Respondent maintains that Petitioner's remaining claims are unexhausted and barred from federal review by procedural default.

Petitioner concedes many of Respondent's procedural arguments. Petitioner does not dispute that he failed to exhaust claims challenging the admission of Grover Clegg's and Larry Matthews's out of court statements and clarifies that Claims I and III(C) are limited to the admission of Steward's hearsay statements. Pet'r Reply at 5-6, 10, 15 (ECF No. 110). I further construe Petitioner's clarification as a withdrawal of Claims V, VI, VIII, IX, XI, XII, XXV, and XXIX or as a concession that these claims are unexhausted. *Id.* at 10, 15. Plaintiff also admits that Claim III(K) is duplicative of Claim III(I) and I consider this claim withdrawn. *Id.* at 6.

Petitioner further concedes that he did not exhaust claims of trial court error asserted in Claims I (relying on *Bruton v. United States*, 391 U.S. 123 (1968)) II, VII, X, XVIII, XIX(A),(B),(C), XXIV, XXVI, XXVII, XXVIII, XXX, XXXI, and XXXII, and claims of ineffective assistance of counsel asserted in Claims III(J), (L), (P), (Q), (T) and Claims IV(F), (H), (O), and (P). *Id.* at 6, 9-10, 13, 15. Finally, Petitioner admits that Claims XIII through XVII, XIX(D),(E), and Claims XX through XXIII are procedurally defaulted because the PCR court found that they could have been raised on direct appeal. *Id.* at 13, 15; *Palmer v. State,* 318 Or. 352, 867 P.2d 1368 (1994) (claims that could have been raised during direct appeal are barred from consideration in state post-conviction proceedings).

However, Petitioner disputes Respondent's argument that he failed to exhaust the ineffective assistance of counsel claims asserted in Claims III(A) through (I**)**, (R), and (S), and Claims IV(A) through (E), (G), (I), (M), and (N). Pet'r Reply at 6-10, 15. Petitioner also argues that he can establish cause and prejudice to excuse the procedural default of the *Bruton* claims asserted in Claims I and X. *Id.* at 13-14.

**6    - OPINION AND ORDER**

A.  <u>Fair Presentation of Ineffective Assistance of Counsel Claims</u>

Claim III includes twenty subparts alleging the ineffective assistance of trial counsel, and Claim IV includes sixteen subparts alleging the ineffective assistance of appellate counsel. As noted above, the parties agree that Petitioner exhausted Claims III(C) and IV(B), (C), (E), and (I) and failed to exhaust Claims III(J), (K), (L), (P), (Q), (T) and IV(F), (H), (O), (P). With respect to the remaining subparts of Claims III and IV, Respondent argues that they, too, are unexhausted, because Petitioner did not present the factual basis for each subpart to the Oregon Supreme Court. *See, e.g., Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008) ("Fair presentation requires that the petitioner describe in the state proceedings both the operative facts and the federal legal theory on which his claim is based so that the state courts have a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.") (internal quotation marks omitted).

After affirmance of the PCR court's decision, Petitioner sought review with the Oregon Supreme Court and specifically raised ineffective assistance of counsel claims corresponding with Claim III(C) and Claims IV(B), (C), (E), and (I). *See* Resp't Ex. 211 at 6-8 (Second and Third Questions Presented). Petitioner's petition for review also presented the following questions:

> <u>Fourth Question Presented</u>
> Was petitioner denied effective assistance of trial counsel on other grounds?
>
> <u>Fourth Proposed Rule of Law</u>
> Yes, petitioner's convictions and sentence should be reversed because of inadequate and ineffective assistance of counsel under Article I, section 11, and the Sixth Amendment, *as explained in petitioner's briefing in the Court of Appeals*.
>
> <u>Fifth Question Presented</u>
> Was petitioner denied effective assistance of appellate counsel on other grounds?

<u>Fifth Proposed Rule of Law</u>
Yes, petitioner's convictions and sentence should be reversed because of
inadequate and ineffective assistance of appellate counsel under Article I, section
11, and the Fourteenth Amendment, *as explained in petitioner's briefing in the
Court of Appeals*.

Resp't Ex. 211 at 8 (emphasis added). The petition for review also stated that Petitioner

"incorporates and relies on the arguments he presented to the Court of Appeals, as permitted

under ORAP 9.05(4)(d). *Farmer v. Baldwin,* 346 Or 67, 73-74, 205 P3d 871 (2009)." *Id.* at 17.

Petitioner contends that his incorporation of arguments presented to the Oregon Court of Appeals

complied with the procedure approved in *Farmer v. Baldwin* and fairly presented the

incorporated claims to the Oregon Supreme Court.

In *Farmer*, this Court found that the petitioner, Farmer, failed to exhaust his federal

claims because they were not presented to the Oregon Supreme Court. *See Farmer v. Baldwin,*

No. 6:02-cv-01565-AA, 2006 WL 1766184 (D. Or. June 22, 2006). Farmer's petition for review

stated only that he "filed a Petition for Post-Conviction Relief and makes all the allegations set

forth therein" and that his "position is also set forth in the appellant's *balfour* brief." *Farmer* v.

*Baldwin,* 346 Or. 67, 70, 205 P.3d 871 (2009); *see also State v. Balfour,* 311 Or. 434, 814 P.2d

1069 (1991).[5] Farmer did not attach a copy of his *Balfour* brief or his PCR petition to the petition

for review. Nonetheless, Farmer argued that his petition for review fairly presented his federal

claims by incorporating his *Balfour* brief filed with the Oregon Court of Appeals, which included

his attached PCR petition alleging federal claims under the Sixth and Fourteenth Amendments.

*Farmer*, 2006 WL 1766184 at *2-3. This Court rejected Farmer's argument, reasoning that "to

---

[5] In *Balfour*, the Oregon Supreme Court approved a two-part appellate briefing process
that allows appointed counsel to meet the obligations of advocacy without violating rules of
professional conduct. *Balfour*, 311 Or. 434 at 451-52. Counsel is permitted to sign "Section A"
of a *Balfour* brief, which includes only a statement of the case and the relevant facts. The
appellant signs "Section B," which presents issues the appellant seeks to raise. *Id.*

**8    - OPINION AND ORDER**

be apprised of petitioner's federal claims, the Oregon Supreme Court would have had to…

review petitioner's *Balfour* brief presented to the Oregon Court of Appeals and peruse the

attached, fifteen-page amended PCR petition alleging almost 100 grounds for relief." *Id.* 2006

WL 1766184 at *3.

On appeal, the Ninth Circuit certified a question to the Oregon Supreme Court and asked

whether Farmer "properly raised" his federal claims by incorporating the attachment to his

*Balfour* brief into his petition for review. *Farmer v. Baldwin*, 563 F.3d 1042, 1044 (9th Cir.

2009). The Oregon Supreme Court accepted the question and explained that Oregon appellate

rules "allow the petitioner to direct our attention to [appellate] briefs to determine the question or

questions presented on review" and that the "incorporation by reference of arguments from his

appellate brief is a permissible method of raising an issue in this court." *Farmer,* 346 Or. at 80.

The Oregon Supreme Court gave Farmer's *Balfour* brief a "fair reading" and "assume[d] that, by

filing his post-conviction petition as section B of his *Balfour* brief, petitioner intended to argue

that his conviction was flawed on the grounds asserted therein." *Id.*

Accordingly, the Oregon Supreme Court held that Farmer's incorporation of his *Balfour*

brief and attached PCR petition adequately presented "a question of law to this court," *id.* at 81,

and the Ninth Circuit found that this Court "erred in ruling that Farmer had not fairly presented

his federal claims." *Farmer*, 563 F.3d at 1044.

Respondent argues that Petitioner cannot rely on *Farmer* because its reasoning applies

only to the incorporation by reference of *Balfour* briefs and not to counseled appellate briefs. *See*

Resp. at 41 (ECF No. 91). I disagree. No language in *Farmer* limits its holding to uncounseled

*Balfour* briefing. Instead, the Oregon Supreme Court rejected the State's assertion "that a

petition for review may not incorporate appellate briefs by reference" and found that a petitioner

**9** **- OPINION AND ORDER**

may "direct our attention to those briefs to determine the question or questions presented on review." *Farmer*, 346 Or. at 73-74, 80.

Next, Respondent maintains that, even if *Farmer* applies, Petitioner's generic claim that he was denied the ineffective assistance of counsel "on other grounds…as explained in [his] briefing in the Court of Appeals" did not fairly present the specific factual basis of those claims to fulfill the exhaustion requirement of § 2254. Response at 41-42; Resp't Sur-Reply (ECF No. 116). According to Respondent, *Farmer* "does not set an expectation that the Oregon Supreme Court will scour the appellate court record searching for discrete and specific claims of ineffectiveness of trial and appellate counsel" and cannot absolve Petitioner of his obligation under federal law to present the factual and legal basis for each claim to the State's highest court. Resp't Sur-Reply at 4-6; *see, e.g., Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim"). Again, I disagree.

As Respondent concedes, Petitioner's petition for review raised federal ineffective assistance of counsel claims and alerted the Oregon Supreme Court "to the presence of a federal" question. *Reese*, 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"). Further, *Farmer* unequivocally held that appellants may present questions for discretionary review through the incorporation of appellate briefing, and the Oregon Supreme Court expressed no qualms about the need to "scour" the record when affirming that it "may consider briefs filed in the Court of

Appeals to identify and evaluate a party's legal arguments on a question presented on review."
*Farmer*, 346 Or. at 73-74, 80; *see also Bardales v. Howton*, No. 6:07-cv-06358-AA, 2010 WL
3866716, at *3 (D. Or. Sept. 26, 2010) (explaining that "*Farmer* explicitly rejected the State's
contention that the Oregon Supreme Court 'will not scour the petitioner's Court of Appeals
briefs as part of its consideration of the petition for review'").

Rather than absolve Petitioner of his obligation under § 2254, the application of *Farmer*
reinforces the principle of comity underlying the exhaustion requirement. "Comity…dictates that
when a prisoner alleges that his continued confinement for a state court conviction violates
federal law, the state courts should have the first opportunity to review this claim and provide
any necessary relief." *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999); *see also Picard v.
Connor*, 404 U.S. 270, 275 (1971) (explaining that exhaustion "reflects a policy of federal-state
comity…designed to give the State an initial 'opportunity to pass upon and correct' alleged
violations of its prisoners' federal rights"). To this end, a petitioner must comply with state
procedural rules and present a federal claim to the highest state court "in a procedural context in
which its merits" will be considered, to ensure that the state court has a fair opportunity to
address the merits of a federal claim. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). "Only if the
state courts have had the first opportunity to hear the claim sought to be vindicated in a federal
habeas proceeding does it make sense to speak of the exhaustion of state court remedies."
*Picard*, 404 U.S at 276.

Pursuant to *Farmer*, Petitioner's incorporation of his appellate briefing provided the
Oregon Supreme Court with an opportunity to review the merits of questions and arguments
raised on PCR appeal. *Farmer*, 346 Or. at 73-74, 80; *see also O'Sullivan,* 526 U.S. at 844
(Section 2254 "requires only that state prisoners give state courts a *fair* opportunity to act on

their claims"). Thus, by its *own* standards, the Oregon Supreme Court had a fair and "first" opportunity to review and address the merits of Petitioner's federal claims asserting the ineffective assistance of counsel on grounds presented in his appellate briefing.

It necessarily follows that the same incorporation by reference fulfilled Petitioner's obligation under § 2254 to fairly present his federal claims to Oregon's highest court. *See Farmer*, 563 F.3d at 1044 ("In light of the Oregon Supreme Court's answer to the certified question, we hold that the district court erred in ruling that Farmer had not fairly presented his federal claims"); *see also Montez v. Premo*, No. 3:14-cv-01551-MC, 2018 WL 4996661, at *8-9 (D. Or. Oct. 15, 2018) (applying *Farmer* and finding exhaustion when the petitioner "did not specifically raise [an ineffective assistance of counsel] claim in his Amended Petition for Review to the Oregon Supreme Court" or a subsequent "merits brief" but "explicitly incorporated his Oregon Court of Appeals brief in the Amended Petition").

Accordingly, the incorporation of Petitioner's appellate briefing into his petition for review fairly presented the merits of the ineffective assistance claims raised in his Fourth and Fifth Questions, and Petitioner exhausted the ineffective assistance of counsel claims asserted in Claims III(A) through (I), (R), (S), and Claims IV(A) through (E), (G), and (I), (M), (N).

B. Cause and Prejudice to Excuse Default of *Bruton* Claims

In part of Claim I and Claim X, Petitioner asserts that the trial court's admission of Steward's hearsay statements and its denial of Petitioner's motions to sever violated his rights under the Confrontation Clause pursuant to the Supreme Court decision in *Bruton*. Petitioner concedes that he failed to exhaust his *Bruton* claims but argues that the procedural default was caused by appellate counsel's unreasonable failure to raise them on appeal. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (recognizing that the ineffective assistance of appellate

counsel may constitute cause to excuse procedural default if the allegations of ineffective assistance were exhausted in state court as an independent constitutional claim).

In Claims IV(B) and (E), Petitioner alleges claims of ineffective assistance based on appellate counsel's failure to raise *Bruton* claims on appeal. Am. Pet. at 55-57. Thus, whether cause exists for the default of Petitioner's *Bruton* claims is intertwined with the merits of Claims IV(B) and (E). As explained *infra* at 27-41, Petitioner fails to show that appellate counsel unreasonably failed to raise *Bruton* claims on direct appeal, and he cannot establish cause and prejudice to excuse the default of these claims asserted in Claims 1 and X.

## II. Reasonableness of State Court Decision

Remaining are Petitioner's exhausted claims of ineffective assistance of trial and appellate counsel as alleged in Claims III(A)-(I), (R), and (S) and Claims IV(A)-(E), (G), (I), (M), and (N), and claims of trial court and cumulative error as alleged in Claim I (relying on *Crawford*) and Claim XXXIII. In his supporting Supplemental Brief, however, Petitioner presents no additional legal argument to support Claims III(D), (F), (G), (I), and (R) and Claims IV(A),(C), (G) and (I).[6] *See* Pet'r Suppl. Br. at 47, 55, 61-63, 71, 78, 88. Upon review of the

---

[6] Claim III(D) alleged that trial counsel failed to present evidence that an individual named "Deandre" and two others were walking by the Head Start office on the morning of Tina Clegg's murder. Claim III(F) alleged that trial counsel failed to object to testimony regarding Grover Clegg's interest in proceeds of a life insurance policy. Claim III(G) alleged that trial counsel failed to impeach Kendra Hughes with prior inconsistent statements. Claim III(I) alleged that trial counsel failed to object to the gender and racial representation of the jury pool. Claim III(R) alleged that trial counsel failed to object to the admission of Tina Clegg's hearsay statements introduced through the testimony of several witnesses.

Claim IV(A) alleged that appellate counsel failed to assign as error the trial court's admission of Tina Clegg's hearsay statements. Claim IV(C) alleged that appellate counsel failed to assign as error the trial court's admission of Steward's hearsay statements introduced through the testimony of Shyra Wade. Claim IV(G) alleged that appellate counsel failed to assign as error the trial court's denial of Petitioner's motion to suppress statements. Claim IV(I) alleged that

state court record, I find that Petitioner fails to sustain his burden to prove that habeas relief is warranted on these claims. *See, e.g.,* Resp't Exs. 202-03; *Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014) (a habeas petitioner bears the burden of proving his case); *Davis v. Woodford*, 384 F.3d 628, 637-38 (9th Cir. 2004) (accord).

The PCR court rejected Petitioner's remaining claims, and Respondent maintains that its decision is entitled to deference.

Pursuant to 28 U.S.C. § 2254(d), this Court may not grant a petition for a writ of habeas corpus filed by a state prisoner with respect to any claim that was adjudicated on the merits in state court, unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1) and (2).

A state court decision is "contrary to" clearly established federal law if it fails to apply the correct Supreme Court authority or reaches a different result in a case with facts "materially indistinguishable" from relevant Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but applies it in an "objectively unreasonable" manner. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). "[A] state prisoner must show that the state

---

appellate counsel failed to assign as error the trial court's denial of Petitioner's motion for new trial arising from Steward's post-trial statements. *See* First Am. Pet. at 32-34, 47-54, 56, 58.

I recognize that Petitioner discussed Claims III(D),(F), and (G) and Claim IV(I) in his initial supporting brief. *See* Pet'r Mem. of Law at 50-51, 53-54, 86-88 (ECF No. 73). However, Petitioner's discussion was brief and fails to establish entitlement to habeas relief.

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Thus, "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson*, 532 U.S. 782, 793 (2001).

Under the well-established precedent of *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner alleging the ineffective assistance of counsel must show that "counsel's performance was deficient" and the "deficient performance prejudiced the defense." 466 U.S. at 687. To establish deficiency and prejudice, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. In the context of appellate counsel, a petitioner must show that "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Unless a petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

Judicial review of an attorney's performance under *Strickland* is "highly deferential" and must afford counsel "wide latitude … in making tactical decisions." *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. In short, a petitioner must overcome the presumption that, under the circumstances, the challenged action "might be

considered sound trial strategy." *Id.* (citation omitted). Further, a "doubly deferential" standard

applies when "a federal court reviews a state court's *Strickland* determination." *Cheney v.*

*Washington*, 614 F.3d 987, 995 (9th Cir. 2010). On federal habeas review, the state court "must

be granted a deference and latitude that are not in operation when the case involves review under

the *Strickland* standard itself." *Richter*, 562 U.S. at 101.

    A.  <u>Ineffective Assistance of Trial Counsel</u>

        1.  <u>Law Enforcement Opinion Testimony – Claim III(A)</u>

     Petitioner argues that trial counsel unreasonably failed to object when the prosecution

introduced the opinion testimony of Officer Wooten and Detective Bellah without establishing

their qualifications. Officer Wooten and Detective Bellah were responding officers at the scene

of Tina Clegg's murder and they testified that they believed the Head Start intruders did not

intend to commit a robbery but instead targeted Tina Clegg. Tr. 1502-03, 1510-11, 1818-20.

     Officer Wooten testified that she had been a police officer for over seventeen years and

had observed many crime scenes involving "murders, shootings, and robberies." Tr. 1498. The

prosecution asked Officer Wooten about her thoughts after she saw Tina Clegg's body, and

Officer Wooten answered, "Looking at her with the bullets down her back, I thought she had

been executed." Tr. 1502. When asked why, Officer Wooten responded, "Well, it's just – in my

experience on the street, very rarely are there multiple bullet wounds, and it looked as though she

was shot as she was laying down." *Id.* Counsel for Grover Clegg objected to this testimony as

lacking a foundation, and the objection was overruled. Tr. at 1502-03.

     Officer Wooten also testified that, after learning the intruders asked for money after Tina

Clegg was shot, she asked Head Start employees whether Tina Clegg had any "enemies" because

she "believed that the intent for this situation was to murder Tina Clegg and not rob Head Start."

Tr. 1510. Grover Clegg's counsel objected and asked for the testimony to be stricken, and the trial court overruled the objection. Tr. 1510-11.

Detective Bellah testified that he had been a police officer for twenty-two years and a detective for thirteen, with assignments in the robbery and homicide units. Tr. 1812-13. Detective Bellah testified that, after viewing Tina Clegg's injuries, "My feeling was this was an intentional homicide. I mean, this was a reason somebody went in there, not a robbery. I've never seen a robbery in my experience where someone was shot like that." Tr. 1819. Grover Clegg's counsel objected to Detective Bellah's testimony as irrelevant and lacking foundation, and the objection was overruled. Tr. 1819-20. Detective Bellah continued that "it didn't make sense to me someone would rob a Head Start administration office" because "robberies are usually where they have cash," and that it "became apparent" to him that "the whole robbery was a ruse to just come in and murder Mrs. Clegg." Tr. 1820. Counsel did not object to this testimony.

Petitioner argues that Officer Wooten's and Detective Bellah's testimony constituted "expert" opinion testimony that required the State to establish their qualifications and specialized knowledge. Petitioner contends that the State failed to do so and trial counsel was deficient by failing to object to the testimony on those grounds.

The PCR court rejected this claim, finding that the testimony "constituted technical or otherwise specialized knowledge rather than scientific evidence" and did not require a scientific foundation under governing Oregon law. Resp't Ex. 202 at 20-21; *see State v. Brown,* 297 Or. 404, 417 (1984) (enumerating factors to "determine the relevance or probative value of proffered scientific evidence"). The PCR court also cited the officers' experience and noted that their testimony was based on observations of "evidence at the crime scene, as well as [] training and

experience" and was "supported by medical examiner testimony that [the] gunshot wounds were consistent with the victim being shot in the back three times at close-range while lying on the floor." Resp't Ex. 202 at 20-21.

Petitioner argues that the PCR court discussed only scientific foundational evidence and failed to address whether the State was required to qualify Officer Wooten and Detective Bellah as experts before introducing their testimony. Petitioner's argument is unpersuasive. The PCR reasonably found that Officer Wooten's and Detective Bellah's testimony was based on their professional experience and personal observations of crime-scene evidence and did not require additional foundational support. *See, e.g., State v. St. Hilaire*, 97 Or. App. 108, 113 (1989) (finding that a detective's testimony "based on first-hand experience" did not require a more specialized foundation).

Moreover, Grover Clegg's counsel repeatedly objected to Officer Wooten's and Detective Bellah's testimony as irrelevant and lacking a proper foundation and trial court overruled each objection. Tr. at 1502-03, 1510-11, 1819-20. Petitioner's counsel reasonably could have reasonably decided that additional objections would be unsuccessful and only highlight their testimony. For the same reason, Petitioner does not show that the trial court would have sustained further objections.

Based on this record, Petitioner fails to establish that counsel's performance was deficient or caused prejudice, and the PCR court did not unreasonably apply *Strickland* in denying this claim.

### 2.   Advising Petitioner of Right to Testify – Claim III(B)

Petitioner asserts that his trial counsel failed to provide adequate advice about his right to testify. *See Rock v. Arkansas*, 483 U.S. 44, 49 (1987) (stating that "it cannot be doubted that a

defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense").

Petitioner maintains that he wanted to testify at trial, but that trial counsel advised against testifying because counsel believed Petitioner's appearance and manner of speech would not make a good impression with the jury. Petitioner argues that he was unaware that he could disregard counsel's advice and demand to testify and that counsel was deficient in failing to ensure that Petitioner understood his rights.

The PCR court rejected this claim, finding that Petitioner was not credible and had discussed the issue of testifying with counsel on several occasions and was aware of his right to testify. Resp't Exs. 202 at 22-24. The PCR court's factual and credibility findings are presumed correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Henry v. Ryan*, 720 F.3d 1073, 1086 n.5 (9th Cir. 2013). Petitioner cites no such evidence. Although the record reflects that Petitioner's counsel advised him against testifying, no evidence supports the claim that counsel made the decision for Petitioner or coerced him into forgoing his rights. *See, e.g.,* Resp't Ex. 126 at 44-45.

Given the evidence of record, the PCR court reasonably found that counsel did not provide ineffective assistance on this ground.

   3.   Steward Hearsay Statements Introduced Through Carlson Testimony – Claim III(C)[7]

Petitioner next alleges that counsel was ineffective by failing to object to the testimony of George Carlson on hearsay grounds.

---

[7] As noted above, *supra* at 6, Claim III(C) is limited to the admission of Steward's hearsay statements.

Carlson was the athletic director and football coach at Steward's former high school. Tr. 3608-09. Steward had dropped out of high school and Carlson testified that Steward approached him in September 1993 and expressed an interest in returning to school and "trying to move in a positive direction with his life." Tr. 3610.

Carlson testified that he and Steward discussed the Head Start shooting and Steward told him that "Larry Matthews had done the shooting and that he and Larry were at odds at the time." Tr. 3610. Steward also told Carlson that "he thought that the reason for the shooting was for the insurance money and that Grover [Clegg] had set it up and that – or, Grover had initiated it and Randall [Clegg] had gone – acted as a go-between to help set it up." Tr. 3610-11. Petitioner's counsel did not object to Carlson's testimony.

Petitioner argues that counsel's performance was clearly deficient because Steward's statements to Carlson were inadmissible hearsay and their admission violated his right to confront witnesses. Petitioner also argues that counsel's failure caused prejudice, because Steward's statements corroborated the prosecution's theory that Petitioner solicited the murder of Tina Clegg at Grover Clegg's behest.

The PCR court found that Petitioner failed to show deficiency or resulting prejudice. The PCR court noted that "Steward's [other incriminating hearsay] statements ... had previously been addressed pre-trial by the court, which had heard arguments from trial counsel, received motions and memoranda objecting to the use of Steward's statements against Grover and Randall Clegg based on hearsay, and denied those motions." Resp't Ex. 202 at 13. The PCR court thus concluded that Petitioner did not establish "that the trial court's ruling [in response to an objection to Carlson's testimony] would have been any different if other arguments were made,

or that improper introduction of the statement because of counsel's inadequacy would have tended to affect the outcome of petitioner's case." Resp't Ex. 202 at 13-14.

The record reflects that defense counsel strenuously objected to the admission of Steward's out-of-court statements made in the presence of other witnesses, and it is surprising that counsel raised no objection to Carlson's testimony. Steward's statements to Carlson directly implicated Petitioner and Grover Clegg in Tina Clegg's murder and the State clearly offered Carlson's testimony for that purpose. Further, it is unclear from the record whether State notified defense counsel that it intended to introduce Carlson's testimony or whether the trial court made findings of reliability and trustworthiness to support the admission of Steward's statements to Carlson.[8] *See Ohio v. Roberts*, 448 U.S. 56, 66-67 (1980) (holding that a non-testifying declarant's hearsay statement is admissible if the declarant is unavailable and the statement bears "adequate indicia of reliability") (internal quotation marks omitted).[9]

However, as noted by the PCR court, the trial court admitted similar hearsay statements of Steward, finding that Steward's statements fell within the hearsay exception of declarations against penal interest and were supported by guarantees of trustworthiness. *See infra* at 28-36; Resp't Exs. 119, 123, 170. Given the trial court's pretrial rulings, trial counsel could have reasonably believed that the trial court would not sustain a hearsay objection to Carlson's

---

[8] During pretrial proceedings, the State identified several of Steward's hearsay statements that it sought to admit, including statements made to Shyra Wade, Neithan Stanley, and Detectives Bellah, Taylor, and Schulz. Resp't Exs. 119-21. Notably, Steward's statement to Carlson was not identified by the State at that time. *Id.*; *see also* Resp't Ex. 170 at 10.

[9] At the time of Petitioner's trial, *Roberts* governed whether hearsay statements could be admitted as substantive evidence against an accused in accordance with the requirements of the Confrontation Clause. Under *Roberts*, a non-testifying hearsay declarant's statement was admissible only if the declarant was unavailable and the statement bore "adequate indicia of reliability," in that it fell "within a firmly rooted hearsay exception" or, if not within a firmly rooted exception, was supported by "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66-67 (internal quotation marks omitted).

testimony. Thus, the PCR court's findings are not objectively unreasonable, and it did not

unreasonably apply *Strickland* when rejecting this claim.

    4.  <u>Limiting Instruction Regarding Hughes Testimony – Claim III(E)</u>

Petitioner claims that trial counsel was ineffective by failing to request a limiting

instruction after hearsay statements of Tina Clegg were introduced through the testimony of

Kendra Hughes.

Hughes was a co-worker of Tina Clegg's at the Head Start office and she testified about a

conversation she had with Tina Clegg shortly before the shooting:

> [W]hen I walked up to Tina's window she seemed very, very happy. I asked her --
> I said hello and asked her what was her happiness about, and she told me that her
> husband loved her.
>
> And I said, "Oh, what brought that on?" And she said, "I just talked to Grover and
> told him Gladys was going to take me to the bank and he said, 'No, no, no,' and
> insisted I not let Gladys take me, that he was going to take me when he took me to
> lunch."

Tr. at 1022. Minutes later, Tina Clegg was shot and killed. Tr. 1023-22; *see also Clegg*, 332 Or.

at 436.

Prior to trial, Grover Clegg and Petitioner moved to exclude Tina Clegg's statements to

Hughes as inadmissible hearsay. Resp't Exs. 162, 172, 177. The trial court denied the motions

and found that the statements were admissible under Oregon Evidence Code 803(3) as evidence

of Tina Clegg's state of mind. Resp't Ex. 170 at 12-13. Defense counsel did not request a

limiting instruction regarding the purpose for which the testimony could be considered, and the

trial court did not give one.

On direct appeal, Grover Clegg challenged the admission of Hughes's testimony, and the

Court of Appeals held that the trial court erred in finding that Tina Clegg's statements were

admissible under the state of mind hearsay exception. *Clegg*, 161 Or. App. at 209-10. The Court

of Appeals explained that "the principal purpose of Kendra Hughes's statements was not to show the victim's state of mind" but rather "offered to show [Grover Clegg's] state of mind," and it found the testimony inadmissible for that purpose. *Id.* at 208-10. The Court of Appeals deemed the error harmless, however, because evidence of Grover Clegg's guilt was "substantial and convincing," "compelling," and "incompatible with innocence," and "there was little likelihood that the erroneously admitted evidence affected the verdict." *Id.* at 210.

The Oregon Supreme Court reversed in part, holding that Tina Clegg's statements to Hughes were admissible under the state of mind exception. *Clegg*, 332 Or. at 441 (stating that "Tina's assertion of her intent to allow Gladys to take her to the bank and her reasons for that intent are not excludable under the general rule against hearsay"). The Court noted that defense counsel did not request an instruction limiting the use of Hughes's testimony and remarked that "once evidence has been admitted without restriction, it can be used by the jury for *any* purpose." *Id.* at 442.

Petitioner argues that trial counsel's failure to request a limiting was unreasonable because it allowed the jury to consider Hughes' testimony as evidence that Grover Clegg wanted Tina to remain at the Head Start office, which in turn bolstered the State's theory of the murder. The PCR court rejected this claim and found that Petitioner failed to establish that a limiting instruction "would have accomplished its putative objective." Resp't Ex. 202 at 14-15. The PCR court's decision was not unreasonable.

Granted, the Oregon Supreme Court found that Hughes's testimony was admissible for any purpose because the trial court gave no limiting instruction to the jury. However, the Oregon Supreme Court did not suggest that Petitioner or the defense would have been entitled to one, as it explained further:

23    - OPINION AND ORDER

> [T]he very timing of [Grover Clegg]'s telephone call, even without information respecting its contents, had some tendency to prove what the contents demonstrated more clearly, *viz.,* that [Grover Clegg] wanted to keep Tina at the office. The prosecution was entitled to use Hughes's testimony to establish that [Grover Clegg] had participated in the murder-for-hire plan by persuading Tina not to go to the bank but, instead, to wait at her desk, thereby ensuring that she would be present when the gunmen arrived.

*Id.* at 442-43. In other words, regardless of a limiting instruction, the Oregon Supreme Court found that the State would not have been prevented from arguing that the telephone call tended to show that Grover called Tina to ensure she stayed at her workplace. *See id.* 442 n.8 ("[Grover Clegg] has not even attempted to show why, if the evidence otherwise were admissible, the prosecution was not entitled to rely on the various inferences that were available from the evidence.").

Moreover, Hughes's statements did not reference Petitioner or implicate his involvement in Tina Clegg's murder. Thus, the PCR court reasonably found that a limiting instruction would not have likely affected the jury's verdict and that trial counsel's failure to request an instruction was not prejudicial.

### 5. Juror View of Petitioner in Shackles – Claim III(H)

Petitioner claims that trial counsel was deficient in failing to move for a mistrial after he told trial counsel that a juror saw him in shackles while he and his co-defendants were being transported to the courtroom.

During his PCR deposition, Petitioner testified that "[t]here was an occasion where myself, my brother, and my co-defendant were coming down from upstairs" to the courtroom while shackled, "[a]nd there was a juror that saw us." Resp't Ex. 126 at 46-47. Petitioner claims that he told trial counsel about the incident and "nothing was done with it." *Id.* at 47. The PCR court implicitly rejected Petitioner's testimony and found that "[t]he evidence does not establish

that a juror actually saw petitioner in custody." Resp't Ex. 202 at 25. This factual finding is entitled to deference. 28 U.S.C. § 2254(e)(1).

Moreover, Petitioner cites no clearly established federal law holding that a presumption of prejudice arises from an inadvertent sighting of a shackled defendant outside of the courtroom. To the contrary, the Ninth Circuit has found that a "jury's 'brief or inadvertent glimpse' of a shackled defendant is not inherently prejudicial." *Ghent v. Woodford,* 279 F.3d 1121, 1133 (9th Cir. 2002) (citation omitted); *see also United States v. Halliburton,* 870 F.2d 557, 561 (9th Cir. 1989) (reiterating that "a jury's brief, inadvertent observation of a defendant in custody does not compel reversal in the absence of an affirmative showing of actual prejudice").

Thus, Petitioner fails to show that the trial court would have granted a motion for mistrial had counsel moved for one, and the PCR court reasonably found no deficiency or prejudice.

6.   Deskins Hearsay Statements – Claim III(S)

Petitioner claims that counsel was ineffective by failing to object to the admission of Curtis Deskins's hearsay statements introduced through the testimony of several witnesses.

Deskins took the stand at trial and testified that in July 1993, Petitioner asked Deskins if he wanted to earn money by doing a "hit" and told Deskins that Grover Clegg wanted "his wife dead." Tr. 2903. After Petitioner confirmed that Deskins was "interested in killing his brother's wife," Petitioner showed Deskins a blue photo album with pictures of Tina Clegg. Tr. 2915. Deskins testified that an initial attempt to kill Tina Clegg was thwarted because she was attending a church service, and a second attempt was unsuccessful after Deskins went drinking with friends and crashed Petitioner's car. Tr. 2923, 2933-35. Deskins testified that a few days later he asked if Petitioner still needed someone to "do that for him" and Petitioner responded that it had been taken "care of." Tr. 2940.

On cross-examination, defense counsel attempted to impeach Deskins's testimony by raising his prior inconsistent statements, the reward money he received for cooperating with authorities, and his immunity agreement with the State.[10] *See, e.g.,* Tr. 2979-3015, 3030-48. The prosecution subsequently called several witnesses to corroborate Deskins's testimony.

Hashim Rhodes, Deskins's cousin, testified that sometime before July 16, 1993, Deskins told him that "somebody approached [Deskins] and asked them if he could smoke his girl, or sister, or something like that; had something to do with a female." Tr. 3224-25. Jerri Lynn Ledbetter, who dated Deskins at the time of Tina Clegg's murder, testified that Deskins told her that Petitioner said his brother, Grover, wanted Deskins to kill Grover's wife. Tr. 3307, 3309. Charlotte Sanders, a co-worker of Tina Clegg's, testified that shortly after Tina Clegg's death, Deskins was at her house when a television station aired a news report about Tina Clegg's murder. Tr. 3552-53. Sanders testified that she told Deskins she knew Tina Clegg, and Deskins responded "that he had been approached by Mr. Clegg, or either someone in his family, to kill Tina." Tr. 3553. Melvin Spencer, another cousin of Deskins, testified that someone named "Randall" called and visited Deskins at Spencer's home in July of 1993. Tr. 4303, 4305-07. Spencer testified that he overheard Randall tell Deskins that "his brother wanted his girl offed" and he – Randall – "was supposed to find someone to do it." Tr. 4309.[11]

Petitioner argues that counsel should have objected to the testimony of Rhodes, Ledbetter, and Sanders on grounds that Deskins's statements were inadmissible hearsay. Pet'r

---

[10] Deskins testified for the State under an agreement immunizing him from criminal liability for charges related to the conspiracy to kill Tina Clegg. Tr. 2897.

[11] In his First Amended Petition, Petitioner asserted that Spencer testified about Deskins's hearsay statements. However, Spencer testified about Petitioner's statements, not Deskins's, and I consider Claim III(S) limited to the testimony of Rhodes, Ledbetter, and Sanders.

Suppl. Br. at. 67-71. The PCR court rejected this claim and found that Deskins's statements to Ledbetter were admissible as co-conspirator statements made in furtherance of a conspiracy and that Petitioner failed to show prejudice arising from the admission of Deskins's hearsay statements. *See* Resp't Ex. 202 at 16-20; Resp't Ex. 203 at 14-15.

Petitioner asserts that the PCR court's opinion is not entitled to deference because Ledbetter was not a co-conspirator and was not involved in the alleged agreement to kill Tina Clegg. Petitioner also argues that the PCR court unreasonably found no prejudice arising from Sanders's testimony and failed to make any findings with respect to Rhodes's testimony.

Petitioner fails to show that he is entitled to habeas relief. On cross-examination, defense counsel implied that Deskins had fabricated his testimony or had an improper motive to testify, and Deskins's out-of-court statements were likely admissible as prior consistent statements. *See* Tr. 215-16; Or. Evid. C. 801(4)(a)(B) (providing that a statement is not hearsay if the declarant testifies at trial, "is subject to cross-examination concerning the statement," and the statement is "consistent with the testimony of the witness and is offered to rebut an inconsistent statement or an express or implied charge against the witness of recent fabrication or improper influence or motive"). Thus, the PCR reasonably found Petitioner failed to show deficient performance or prejudice arising from counsel's failure to object to this testimony.

B. <u>Ineffective Assistance of Appellate Counsel</u>

1. <u>Admission of Steward Statements and Denial of Severance – Claims IV(B), (E)</u>

Petitioner argues that appellate counsel was ineffective for failing to challenge the admission of Steward's hearsay statements and the denial of severance as violation of Petitioner's confrontation rights pursuant to *Bruton*. Petitioner maintains that had appellate

counsel raised these arguments, it is likely that the Oregon Court of Appeals would have found Steward's statements inadmissible and reversed Petitioner's conviction.

Prior to trial, the prosecutor moved for the admission of Steward's out-of-court statements made in the presence of three police detectives and several lay witnesses. Resp't Exs. 119-21, 122 at 6; *see also* Tr. at 410-27. The prosecutor argued that Steward's statements were admissible against all three defendants as declarations against Steward's penal interest and as statements made in the furtherance of a conspiracy. Alternatively, the prosecutor argued that if Steward's statements were inadmissible against Petitioner and Grover Clegg, their names could be redacted from Steward's statements. Resp't Ex. 121 at 20-25.

Petitioner objected to the admission of Steward's statements on grounds that the statements were inadmissible hearsay and admission of the statements would violate their rights of confrontation. Resp't Exs. 122, 172, 176-78. Petitioner also argued that the proposed redactions were inadequate and moved to exclude Steward's statements or, alternatively, to sever Petitioner's trial from that of his co-defendants. *See id.*; Tr. 462-68; *see also* Tr. 726-27, 1725-26, 1784-85.

The trial court denied Petitioner's motions and concluded that Steward's statements were excepted from the hearsay rule as declarations against penal interest and were supported by guarantees of truthfulness. Resp't Ex. 170 at 10-12; *see also* Resp't Ex. 123. Ultimately, the trial court admitted several of Steward's out of court statements as substantive evidence against Petitioner and allowed additional statements that omitted references to Petitioner or Grover Clegg. *See, e.g.,* Tr. 1710-24, 1729, 1733-35, 1785; Resp't Exs. 158-60.

On direct appeal, Petitioner's appellate counsel did not assign error to the trial court's admission of Steward's statements or its denial of severance. Resp't Ex. 204. Petitioner contends

that counsel was ineffective in failing to do so, because the admission of Steward's statements, with or without redactions, violated his right of confrontation under *Bruton* and severance was required to remedy the violation.

"The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.'" *Cruz v. New York*, 481 U.S. 186, 189 (1987). This right of confrontation, extended to the States by the Fourteenth Amendment, includes an accused's right to confront and cross-examine witnesses. *Id.* "Where two or more defendants are tried jointly, therefore, the pretrial confession of one of them that implicates the others is not admissible against the others unless the confessing defendant waives his Fifth Amendment rights so as to permit cross-examination." *Id.* at 189-90.

In *Bruton*, the Supreme Court addressed whether a non-testifying defendant's incriminating statement is admissible against a jointly tried co-defendant when the jury is given a limiting instruction. There, the trial court allowed the prosecution to admit a defendant's out-of-court confession and instructed the jury that the confession was inadmissible hearsay against a co-defendant and could not be considered when determining the co-defendant's guilt or innocence. *Bruton*, 391 U.S. at 124-25. The Supreme Court held that the limiting instruction did not overcome the "substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt." *Id.; see also id.* at 136 ("The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination."). The Supreme Court explained that "a confession that incriminates an accomplice is so 'inevitably suspect' and 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its

instructions could not be applied." *Lee v. Illinois*, 476 U.S. 530, 542 (1986) (quoting *Bruton,* 391 U.S. at 136).

The Supreme Court later considered whether *Bruton* is violated "when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." *Richardson v. Marsh*, 481 U.S. 200, 202 (1987). The Court concluded that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence" *Id.* at 211; *see also Gray v. Maryland*, 523 U.S. 185, 192 (1998) ("Unless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found.").

a.  Steward's Out of Court Statements Admitted Against Petitioner

The trial court admitted the following tape-recorded interview between Steward and Detectives Bellah and Taylor on December 1, 1993. The trial court instructed the jury that Steward's statements were "to be considered against all three defendants." Tr. 1929-30.[12]

Bellah:    Reschard, we, we made one tape earlier where you had talked to us about uh, Larry Matthews talking to you about the homicide of Tina Clegg, uh, we've, we've been talking and you've told us some different things uh, from the first time and we'd like to get that information. When did uh, you first talk to Larry Matthews about this homicide?

Steward:   Two days before.

\*\*\*

---

[12] Steward's tape-recorded statements were not transcribed into the record at trial, and the record reflects the proposed redactions offered by the State and presumably approved by the trial court. Tr. 1901, 1906, 1930; Resp't Exs. 122 at 12-18, 158, 160.

| | |
|---|---|
| Bellah: | And Larry paged you? |
| Steward: | Yes. |
| Bellah: | And he and who met you? |
| Steward: | Him and Randall Clegg. |
| Bellah: | Okay, can you tell us about that conversation please? |
| Steward: | He, he came to my house, my sister's house and he picked me up and he asked me how I felt about uh, how I felt about uh, gettin' some, how I felt about earnin' some money and I was like I'm always want'a earn some money, he's like well I'll give you a thousand dollars to help me do something. And I said, uh, do what? No he said I'll give you five hundred dollars to help me do somethin', and I said do what? And uh, he said uh, miss somebody, I said what you mean miss somebody? Who? And he said Randall's sister-in-law and I was like, what, why what you talkin' 'bout? And he was like, well uh, her husband wants her gone for he can collect the insurance money and so he's tryin' to pay somebody to do it, you know I'll just give you action at it, you know I was like nah hell no, he was like I'll give you a thousand dollars and I like man, uh, huh-uh, nope, hell no. |

\* \* \*

|  |  |
|---|---|
| | Yeah, and we got to da house and uh, he was like well why don't you do, I need a car, he said I need a car to do it. And I was like, well a, he asked if I'd steal a car for him and I was like yeah, he gave me a hundred dollars. And uh, uh the next day, er, yeah the next night we went and I stole a car and he dropped me off and I was done with him. |

\* \* \*

| | |
|---|---|
| Taylor: | Where did you drive [the stolen car] to? |
| Steward: | About six blocks and I traded cars with Randall, Randall drove. No with Larry, Lar, Larry drove that car, I drove Larry's car and I followed Larry to around the corner from his house and I got in Larry's car, no Larry got back in his car and drove me out to my house. |

\* \* \*

**31    - OPINION AND ORDER**

| | |
|---|---|
| Bellah: | 'Kay. Uh, when did you talk to, or did, oh was Randall there when you stole the car? |
| Steward: | No, no, no, is a mistake, Randall was not there, just Larry and I. |

* * *

| | |
|---|---|
| Bellah: | Okay let me put another way, have you ever talked to Randall directly about this? |
| Steward: | No, Randall and Larry talked about it while I was at presence. |
| Bellah: | Okay what did they say? |
| Steward: | Uh, Larry was just like laughin' about it you know, he was just laughin' about how he got paid, he said he got paid for it and the bitch is gone. |

***

| | |
|---|---|
| Bellah: | I mean when, I mean when did you overhear that conversation? |
| Steward: | That was like a week later. |
| Bellah: | And where were you? |
| Steward: | At Larry's house. |
| Bellah: | Was Randall present? |
| Steward: | Yeah. |

***

| | |
|---|---|
| Taylor: | During that conversation did Randall say anything? |
| Steward: | No, just basically laughed, Randall like, he likes scary toward Larry he doesn't really do nothin', you know, he's just like the ma, the little guy. |
| Bellah: | He's scared of Larry? |
| Steward: | Yeah, he's, yeah Larry has him sellin' dope for him and all kinds of stuff, Randall is just scared of Larry. |

Resp't Ex. 122 at 12-18; Tr. 1930.

**32    - OPINION AND ORDER**

The State also elicited testimony from Detective Schulz about incriminating statements

Steward made during an interview on December 2, 1993:

Q:    When you started your interview [with Steward], what did he tell you?

* * *

A:    -- that he had been engaged in a conversation with a subject by the name
      of Larry Matthews. And Mr. Steward said that Larry Matthews had told
      him, Mr. Steward, that he, Larry Matthews, had shot and killed Christina
      Clegg. That this crime had been arranged on behalf of Grover Clegg by his
      brother, Randall Clegg. And he denied that he, Mr. Steward, had been
      personally involved in this; he just indicated that this information had been
      given to him in the course of a conversation.

***

Q:    Okay. Did he eventually change his testi- – or, his statement to you?

A:    Yes, he did.

* * *

A:    He told me that he had, in fact, been approached by Larry Matthews, and
      that Larry Matthews had asked him to participate in shooting and killing
      Christina Clegg. Mr. Matthews – Mr. Steward said that Larry Matthews
      told him that he had been approached by Randall Clegg on behalf of his
      brother, Grover Clegg, to kill Mr. Grover Clegg's wife, Christina Clegg.
      And that he would pay Mr. Steward $500 to participate in killing Christina
      Clegg. Mr. Steward told me that he declined to participate in the shooting,
      quote, "because $500 wasn't enough for a murder," end quote. He went on
      to state that he did agree to steal a vehicle for Larry Matthews to use in the
      commission of this crime. He said that he agreed to steal the car for Larry
      Matthews because Larry Matthews didn't know how to steal a car and. . . .
      he was very good at stealing cars and that he had agreed to steal this car
      for Larry Matthews and that he knew that the car would be used in the
      commission of the crime involving the shooting of Christina Clegg.

***

He went on to say that he had helped them plan the crime, that Matthews
had asked him how they could get away with this shooting, and that he,
Reschard Steward, had told him, quote, "I helped them plan it. I told them
to make it look like a robbery, make it look like they were after money,"

unquote. He denied that he was personally involved in the shooting. He denied that he was the second subject.

***

Q:    Did you ask him if he, you know, the fact that he was stealing a car and knowing what it was going to be used for, if that bothered him any?

A:    Yes. And he said, quote, 'Randall Clegg is her brother-in-law. If he didn't care about her, why the shit should I,' end quote.

Tr. 3529-33.

Finally, the State elicited the following testimony from Neithan Stanley, a childhood friend of Steward's:

Q:    [W]as there a time when Reschard Steward wanted to tell you something about [Tina Clegg's murder]?

A:    Yeah – yes and no. He – when I got news of it, I didn't – I didn't know what was going on.

***

Q:    What did he say?

***

A:    That there were four people involved in the shooting; Larry was the gunman, Larry Matthews, and Randall Clegg was one of the lookouts and there was a driver, and there was another mysterious person that I didn't know.

***

Q:    When [Steward] talked about - after he told you not to tell anybody, did he ever describe to you how Larry Matthews told him he had done the shooting?

A:    Yes.

Q:    What did he tell you?

A:    He said that they ran in – that Larry ran in with somebody else and they started screaming this, was saying about where's the money, or where the

**34    - OPINION AND ORDER**

money, and Larry put his hand over his face (indicating), and he started
shooting the lady.

Tr. 3574-81.

Petitioner claims that the admission of Steward's unredacted statements as evidence
against him was a direct violation of *Bruton* and appellate counsel unreasonably failed to raise
this issue on appeal. The PCR court rejected this claim, finding that a "reasonable person in
Steward's position would not have made the statements unless they were true," and that
Steward's statements were "incriminating, contrary to penal interest," and "trustworthy." Resp't
Ex. 202 at 36. The PCR court also found that the "trial court ruling involved a recognized
hearsay exception and careful consideration of confrontation clause concerns prior to the
admission of the statements" and it concluded that appellate counsel "was neither inadequate nor
ineffective in failing to assign error to Steward's statements not being redacted, because the
statements did not involve inadmissible hearsay." Resp't Ex. 202 at 35-36. The PCR court's
decision did not unreasonably apply clearly established federal law and is entitled to deference.

*Bruton* involved the admission of a hearsay statement that was admissible only against
the declarant-defendant, and the pertinent question was whether the trial court's limiting
instruction sufficiently protected a co-defendant's confrontation rights. *See Bruton*, 391 U.S. at
128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly
inadmissible against him under traditional rules of evidence…, the problem arising only because
the statement was … admissible against the declarant"). Unlike *Bruton*, the State here argued
that Steward's statements were admissible against Petitioner and Grover Clegg under the hearsay
exception of declarations against penal interest. *Bruton* did not address this issue, and the
Supreme Court expressly declined to consider it, recognizing that the confession in that case was
not admitted under a "recognized exception to the hearsay rule… and we intimate no view

whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Id.*; *see also United States v. McCown*, 711 F.2d 1441, 1448 (9th Cir. 1983) (finding *Bruton* "inapplicable" to statements of co-conspirator made in furtherance of a conspiracy); *United States v. Arceneaux*, 437 F.2d 924, 927 n.5 (9th Cir. 1971) (noting that "*Bruton* expressly refrained from the expression of an opinion in cases where the hearsay rule is not violated").

Furthermore, the trial court found *Bruton* inapplicable to the admission of Steward's hearsay statements in accordance with *State v. Nielsen*, 316 Or. 611 (1993). There, the Oregon Supreme Court found that the framework of *Ohio v. Roberts*, rather than *Bruton*, governed the question of whether a non-testifying defendant's inculpatory hearsay statement was admissible against a co-defendant. 316 Or. at 622-23. The Oregon Supreme Court explained that *Bruton* was "limited to its facts; a joint trial where the unconstitutionally obtained confession of a non-testifying co-defendant was, as to the defendant, inadmissible hearsay." *Id.* at 632, n.16. Applying the factors enumerated in *Nielsen* and *Roberts*, the trial court concluded that Steward's unredacted statements fell within a recognized hearsay exception and were supported by guarantees of truthfulness. Resp't Ex. 170 at 10-12.

Petitioner does not assert that Steward's hearsay statements were inadmissible under *Roberts* or that appellate counsel was deficient by failing to challenge the admission of Steward's statements on those grounds. *See* First Am. Pet. at 5-20, 55-56; *Roberts*, 448 U.S. at 66-67; *see also Lee*, 476 U.S. at 545 (stating that "a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another"). Rather, Petitioner's claim is based solely on *Bruton.*

36    - OPINION AND ORDER

Given the holdings in *Bruton* and *Nielsen*, it was not objectively unreasonable for Petitioner's appellate counsel to forgo *Bruton* claims on direct appeal, as such claims would have likely been futile. Accordingly, the PCR court's decision did not unreasonably apply *Strickland*.

      b.  <u>Steward's Redacted Hearsay Statements</u>

The trial court admitted the following redacted tape recording of the telephone call between Steward and Detective Bellah on September 9, 1993:

BELLAH:     Ah, what's, what do you have?

STEWARD:  Um, well, I know where the murder weapon is.

BELLAH:     Okay.

STEWARD:  I know his name. I know where he lives.

BELLAH:     Okay. Who is he?

STEWARD:  Larry Matthews

***

STEWARD:  And, ah, I know why he did it and ...

BELLAH:     Okay, why did he do it?

STEWARD:  _____ to collect the insurance money.

BELLAH:     Ah-huh.

STEWARD:  So he hired Larry and Larry's friend. I don't know his friend's name.

BELLAH:     Okay.

STEWARD:  And they got, they paid them for it to do it.

BELLAH:     Do you know how much they paid them?

STEWARD:  No, I don't.

BELLAH:     How do you know this, sir?

**37   - OPINION AND ORDER**

STEWARD: Well, me and Larry are real good friends with, you know, ah, he tells me everything. I was with him the night before it happened.

* * *

     [Larry] told me that his friend _____ asked him to do a job for him and he said that he went to the, ah, to pick up the stolen car and his friend. He went to the place and just started shooting her. And then he went into back room and he shot some woman so it wouldn't like it was, you know, planned like that.

BELLAH: Ah-huh.

STEWARD: They were asking for money so that they'd think it was robbery, more of a robbery.

* * *

BELLAH: Okay. He keeps the gun in, under his dad's mattress?

STEWARD: Yeah. I, I believe it's his dad's gun. I don't know, though.

BELLAH: _____

STEWARD: _____

BELLAH: Oh.

Steward: _____

BELLAH: Okay. He didn't tell you at the time, ah, how much money he got?

STEWARD: No.

Resp't Ex. 160 at 3-6; Tr. 1901.

   Petitioner argues that appellate counsel should have assigned error to the admission of Steward's September 9 statements, because the statements were inadmissible against him and the State's redactions failed to cure the *Bruton* violation. *See United States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001) ("Under *Bruton* and its progeny, the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially,

expressly, clearly, or powerfully implicates the defendant."). Petitioner maintains that replacing references to him with "blank" spaces did not sufficiently sanitize Steward's statements, because the context clearly implicated Petitioner's involvement. Petitioner relies on *Gray v. Maryland*, 523 U.S. 185 (1998), where the Supreme Court held that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration…leave statements that closely resemble *Bruton*'s unredacted statements … and require the same result." *Id.* at 192.

The PCR court rejected this claim and found that Steward's September 9 statements "were properly redacted to eliminate references to petitioner and co-defendant Grover Clegg, and submitted to the jury with a limiting instruction" and that Petitioner failed to show "that designation and argument of this issue by appellate counsel would probably have been successful on appeal." Resp't Ex. 202 at 34-35. Petitioner contends that the PCR court's ruling unreasonably applied *Bruton* and its progeny and is not entitled to deference.

I am not persuaded that the PCR court's decision was unreasonable. First, the redactions in Steward's statements were not "obvious" and did not directly implicate or reference Petitioner. *Gray*, 523 at 193-94. Steward's redacted statements indicated that someone wanted to murder Tina Clegg "to collect the insurance money," implicating Grover Clegg rather than Petitioner, and that a "friend" hired Matthews and another "friend" to commit the murder. *See* Resp't Ex. 160 at 3-11. Nothing in Steward's redacted September 9 statement suggests that either "friend" was Petitioner. At most, Steward's redacted statements became incriminating only when considered with other evidence presented at trial. *See Richardson*, 481 U.S. at 208 (finding no *Bruton* violation when "the [redacted] confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial").

**39     - OPINION AND ORDER**

Second, the Supreme Court issued *Gray* approximately eight months after Petitioner's appellate counsel filed an opening brief on direct appeal. Resp't Ex. 104 at 57. Given that *Richardson* approved the admission of a co-defendant's confession with redactions and a limiting instruction, appellate counsel could have reasonably determined that assigning error to the September 9 redactions would not have been meritorious. Finally, even if Steward's redacted September 9 statement did not comply with *Gray*, Petitioner fails to show that the admission of this statement was not harmless in light of the evidence presented at trial. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause violations are subject to harmless-error analysis).

The trial court also admitted a redacted tape recording of the telephone call between Steward and Detectives Bellah and Taylor on September 11, 1993. Respondent argues that Petitioner did not challenge Steward's September 11 statements during his PCR proceeding and that any claim based on these statements is unexhausted and barred from federal review. *See* 28 U.S.C. § 2254(b)(1)(A); *Duncan*, 513 U.S. at 365-66 (1995).

Petitioner does not dispute this argument, and the record reflects that he did not assert a PCR claim based on appellate counsel's failure to challenge the admission of Steward's September 11 statements. Resp't Ex. 117 at 106-07; Resp't Ex. 205 at 167-68. Petitioner can no longer raise this claim in the Oregon courts, and it is barred from federal review through procedural default.

### c.   Motion to Sever

Petitioner also argues that appellate counsel should have assigned error to the trial court's denial of motions to sever Petitioner's case for trial, on grounds that the admission of Steward's

hearsay statements violated Petitioner's confrontation rights under *Bruton* and required severance as a proper remedy.

As discussed above, *Bruton* did not bar the admission of Steward's unredacted statements because the trial court found that the statements fell within a recognized hearsay exception and were supported by guarantees of truthfulness. Resp't Ex. 170. Further, Steward's September 9 redacted statements did not reference or implicate Petitioner, and at the time of Petitioner's appeal, it would not have been reasonably apparent that the redactions were insufficient. For these reasons, appellate counsel could have reasonably determined that no basis existed to challenge the denial of severance under *Bruton*, and Petitioner fails to show that the PCR court unreasonably applied *Strickland* when denying this claim.

### 2. Denial of Motions to Compel Discovery – Claim IV(D)

Petitioner contends that appellate counsel was deficient by failing to assign error to the trial court's refusal to compel the disclosure of statements Steward made during plea negotiations with the State.

Sometime prior to trial, Steward engaged in discussions with prosecutors about resolving the charges against him. Defense counsel sought the disclosure of statements made by Steward during those negotiations to determine whether they were exculpatory or provided grounds to impeach Steward's hearsay statements the State sought to admit. Resp't Ex. 166-67, 177. The trial court denied this motion, finding that Steward's statements were inadmissible and shielded from disclosure under Oregon law. Resp't Ex. 123; *see also* Or. Rev. Stat. §§ 135.435(1)(c)**,** 135.445; Or. Evid. Code. 410.

Appellate counsel did not assign error to the denial of Petitioner's motion, and Petitioner contends that counsel was ineffective in failing to do so. The PCR court denied this claim,

finding that the trial court's decision was supported by the "on-point" ruling in *State v. Hubbard*, 113 Or. App. 587 (1992) and that appellate counsel was not ineffective by failing to assign error to it. Resp't Ex. 202 at 36-37.

Petitioner argues that the PCR court's decision is not entitled to deference because state law cannot trump Petitioner's federal due process right to exculpatory or favorable evidence as set forth in *Brady v Maryland*, 373 U.S. 83 (1963). Respondent counters that Petitioner did not present a *Brady* argument to the Oregon appellate courts during his PCR proceeding and that any claim relying on *Brady* is unexhausted and procedurally defaulted. *See* Resp't Ex. 205 at 192-99.

Regardless of procedural default, no evidence of record reflects the substance of Steward's allegedly undisclosed statements and Petitioner fails to show that the statements were exculpatory and subject to disclosure under *Brady*. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (explaining that *Brady* evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"). Thus, Petitioner cannot show that appellate counsel was deficient by failing to allege error on this ground or that he suffered prejudice.

### 3.   Exclusion of Evidence Regarding Violent Crimes – Claim IV(M)

Petitioner argues that appellate counsel should have assigned error to the trial court's exclusion of testimony regarding crimes committed near the Head Start office.

During the cross-examination of Detective Bellah, defense counsel attempted to elicit testimony about robberies in the Head Start neighborhood that involved violence but no theft of money or valuables. Tr. 2286-90. The trial court sustained the prosecutor's objection to such testimony, stating that, even if the incidents were "marginally relevant . . . they clearly get into totally side issues. . . . And I'm just not going to extend this trial into that kind of a three-ring circus." Tr. 2290. Later in the trial, defense counsel proffered expert testimony about general

crime statistics in the neighborhoods surrounding the Head Start office. Tr. 5832-42. The trial court sustained an objection on grounds of relevance and excluded the testimony. Tr. 3842.

Before the PCR court, Petitioner argued that appellate counsel was ineffective by failing to assign error to the trial court's exclusion of "evidence regarding instances in which individuals are killed during robberies in which no money is taken" along with relevant crime statistics. Resp't Ex. 199 at 6; *see also* Resp't Ex. 117 at 146-49. The PCR court found no deficiency or prejudice arising from the trial court's exclusion of robberies in the Head Start area, reasoning that the trial court "properly acted in accordance with its discretionary powers…and did not abuse its discretion in limiting [that] line of questioning." Resp't Ex. 202 at 43-45.

Petitioner argues that the PCR court's decision is not entitled to deference because it failed to address the trial court's exclusion of crime statistic evidence.[13] Regardless, based on the evidence presented at trial, the trial court was within its discretion to exclude crime statistic evidence as irrelevant, and appellate counsel could have reasonably concluded that raising this assignment of error would not be successful and would only detract from more meritorious arguments. Accordingly, Petitioner fails to show that the PCR court unreasonably applied *Strickland* in denying this claim.

### 4.  Denial of Motion for Mistrial Arising from Closing Argument – Claim IV(N)

During closing argument, the prosecution referenced the conduct of Ikaim Glover, one of the State's witnesses, as he left the witness stand:

> But Mr. Glover got off the stand and walked over to the door, and before he left the door, what did he do? He turned to Randall Clegg and gave him a little sign. Do you think that's an old Boy Scout signal, see you, Jose? No, Mr. Glover is just

---

[13] Respondent points out that Petitioner's PCR petition did not assert a claim of appellate counsel error arising from the failure to challenge the exclusion of crime statistic evidence. *See* Resp't Ex. 199. However, Petitioner raised the claim in his PCR trial memorandum and presented it to the PCR court. Resp't Ex. 117 at 146-49.

> another gang member. Mr. Glover is showing his connection to Randall Clegg,
> and would suggest to you that Ikaim Glover didn't think that he hurt Randall
> Clegg by having to come in and answer to a subpoena from the State and testify.

Tr. 6214. Petitioner moved for a mistrial based on the prosecutor's reference to "gang signs" and "matters outside evidence." Tr. 6243-44, 6248-49. The trial court denied the motion and noted that Glover had "made a dramatic gesture which was seen by myself and my staff and I'm sure half the jury, at least. Everybody who's facing in that direction could see it." Tr. 6245. Appellate counsel did not challenge the denial of mistrial on appeal, and Petitioner maintains that this failure was unreasonable and prejudicial.

The PCR court found that appellate counsel was not deficient in failing to assign error to the denial of mistrial, finding that the trial court acted "well within its discretion" and that Petitioner failed to show that raising this issue would have likely resulted in a different outcome on appeal. Resp't Ex. 202 at 45. These findings are not unreasonable.

The prosecutor's comment was not related to Petitioner's culpability in Tina Clegg's murder and instead suggested that Petitioner was associated with gang members. As the trial court noted, members of the jury could also see Glover's gesture, and the jury heard testimony regarding the potential gang associations of Petitioner, Matthews, and Steward. While the prosecutor's comment was neither relevant nor helpful, it was not so prejudicial as to warrant a mistrial when considered in context of the lengthy trial and the volume of evidence presented.

Accordingly, Petitioner fails to show that the PCR court unreasonably applied *Strickland* when rejecting this claim.

/ / /

/ / /

/ / /

**44   - OPINION AND ORDER**

C.  Trial Court and Cumulative Error Claims

     1.  Admission of Hearsay Statements– Claim I

In Claim I, Petitioner alleges that the trial court's admission of Steward's hearsay statements ran afoul of *Crawford*, a decision issued almost ten years after Petitioner's trial and seven years after his direct appeal. In *Crawford*, the Supreme Court held that "testimonial statements" of non-testifying witnesses, such as statements made during police questioning, are inadmissible against an accused unless the declarant is unavailable and the accused had a "prior opportunity to cross-examine." *Id.* at 59-60. *Crawford* thus overruled *Roberts* as it applied to testimonial statements. *Crawford*, 541 U.S. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'")

The PCR court rejected this claim because *Crawford* does not apply retroactively on collateral review. *Whorton v. Bockting,* 549 U.S. 406 (2007). In his supporting brief, Petitioner presents no additional argument in support of his *Crawford* claim, and the PCR court reasonably rejected it pursuant to the ruling in *Whorton*.

     2.  Cumulative Error – Claim XXXIII

Finally, in Claim XXXIII, Petitioner claims that his conviction should be reversed due to cumulative errors that occurred during his trial. In some cases, the cumulative effect of several errors may cause prejudice to the extent that a conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003). However, when "no error of constitutional magnitude occurred, no cumulative prejudice is possible." *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Petitioner does not establish constitutional error and cannot obtain federal habeas relief on this basis.

**45    - OPINION AND ORDER**

<u>CONCLUSION</u>

For the reasons set forth above, Petitioner failed to exhaust Claims I *(relying on *Bruton*),* II, III(J), III(L), III(P), III(Q), III(T), IV(F), IV(H), IV(O)-(P), and V through XXXII, and Claims III(K), V, VI, VIII, XI, XII, XXV, and XXIX are either duplicative or unexhausted. Petitioner does not assert cause and prejudice to excuse the default of these claims, and they are barred from federal habeas review. Further, Petitioner fails to show that the PCR court unreasonably applied clearly established federal law when it denied Claims I (*Crawford*), Claims III(A)-(I), III(R), III(S), IV(A)-(E), IV(G), IV(I), IV(M)-(N), and Claim XXXIII. Accordingly, the Amended Petition for Writ of Habeas Corpus (ECF No. 53) is DENIED.

A Certificate of Appealability is DENIED on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this <u>20th</u> day of December 2024.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge